MICHAEL E. FRANEY, Appellee, vs. THE UNION STOCK
YARD AND TRANSIT COMPANY OF CHICAGO, Appellant.

*Opinion filed June 18, 1908—Rehearing denied October 13, 1908.*

1. NEGLIGENCE—*when a stock shipper is not a mere licensee.*
Where a stock yards company maintains a building containing pens
for stock, in which the stock is driven, after being unloaded from
the cars, to be fed and watered by the shipper with food and water
provided by the company, which privileges are paid for by the ship-
per, a shipper who is upon the premises to care for his stock is not
a mere licensee but is there upon implied invitation of the company,
which owes to him the duty of exercising reasonable care to guard
against his being injured.

2. EVIDENCE—*when proof of custom is admissible.* In an action
by a shipper against a stock yards company for injuries received
by falling through a hole in the floor near the division fence of a
stock pen over which he had climbed to use the hydrant provided
by the company for watering stock, evidence tending to show a
general custom of shippers to climb the fences between the pens
when attending their stock is competent, and the degree of care
required of the company should be determined in view of the gen-
eral practice of those rightfully upon the premises.

CARTWRIGHT, C. J., and SCOTT and DUNN, JJ., dissenting.

APPEAL from the Branch Appellate Court for the First
District;—heard in that court on appeal from the Circuit
Court of Cook county; the Hon. JOHN L. HEALY, Judge,
presiding.

Michael Franey recovered a judgment in the circuit
court of Cook county against the Union Stock Yard and
Transit Company for $17,500 for personal injuries charged
to have resulted from the negligence of the defendant, and
that judgment has been affirmed by the Branch Appellate
Court for the First District. By its further appeal the de-
fendant below brings the record to this court for review.

The declaration, which is in one count, charges that
appellant negligently permitted a large hole to remain in
close proximity to the hydrant which was being used by ap-
pellee, and negligently failed to provide any proper guard

or barrier about or over said hole, and negligently failed to have the same lighted in any manner.

Appellant was in possession and control of the premises, structures and enclosures known as the Union Stock Yards of Chicago. Appellee was a shipper of hogs to that market and had been so engaged for more than twenty years. For the convenience of shippers and buyers the appellant maintained a structure known as the hog house, which was two stories high and contained 2800 pens,—1400 on each floor. These pens were arranged in tiers, separated by passages or alley-ways. The pens were, with a few exceptions, twenty feet long and sixteen feet wide, enclosed by double board fences four feet high. The division fences between the pens were constructed by fastening boards on both sides of the posts. To supply the pens with water a hydrant was located at one end of the division fence, with a movable spout attached to it in such a way that water could be supplied to two adjacent pens from the same hydrant. The water troughs were placed parallel with the division fence, and were fourteen feet long, twelve inches wide and six inches deep. Hog pens Nos. 56 and 57 adjoined each other in the second tier of pens on the upper floor, and were equipped with hydrant, spout and water troughs as above described. Appellant had constructed an overhead passageway for the purpose of transferring live stock over the hog house to other parts of the yards. As a result of the construction of this overhead passageway, which crossed above pens Nos. 56 and 57, the east end of these pens was rendered dark. To overcome this difficulty appellant divided pen No. 57 by fencing off eight feet east and west and sixteen feet north and south of the east end of No. 57. A double fence, similar in appearance and construction to all the other division fences, was erected separating those portions cut off from the rest of pen No. 57. Appellant then cut a hole in the floor of the eastern part of No. 57, leaving a floor space three feet wide along the entire length of the east

and south sides of the cut-off. The watering trough in No. 57 occupied one-third of the floor space left on the south side of the space cut off from No. 57 and extended from the partition fence in No. 57 west into that part of No. 57 reserved for use by appellant as a hog pen. On the morning of November 13, 1901, about six o'clock, appellee arrived at appellant's yards with a car-load of hogs consigned to the National Live Stock Commission Company. Appellant received appellee's hogs, and they were unloaded and driven through an alley-way to pen 56. The gate of pen 56 was opened by one of appellant's servants and after the hogs were driven in the gate was locked. Appellee followed his load of hogs from the car to the pen and went into the pen where his hogs were, either through the gate or by climbing the fence. Appellee then went to the hydrant in the north-east corner of his pen for the purpose of watering his hogs. He attempted to pull the spout, which had been last used for pen 57, so as to turn the water into 56. The opening between the boards on the fence, and through which the pipe had to be drawn, was about three inches. The spout was hard to turn, and appellee could not adjust it while standing in 56, with the thirsty hogs crowding about his feet. He then climbed over the division fence from 56 into what he supposed was pen 57. After climbing over the fence he stood on the projecting platform or floor left by appellant on the south side of the cut-off from 57. He pushed the spout through the opening in the fence and turned the water on for the purpose of watering his hogs. He testified that he remembers hearing the water flow into the trough, which is the last fact that he does remember. He was afterwards picked up in an unconscious condition from the floor beneath and conveyed to Mercy Hospital, where, upon examination, it was discovered that he had sustained a fracture of the base of the skull, extending through the right eye socket and back from the temple to the right ear, then upward. He had concussion of the brain, and the

right eye was forced upward and outward, so that it was somewhat crossed. He was bleeding from the nose, mouth and ear, and while he was being examined he vomited mouthfuls of blood. His injuries were very severe and permanent. At the time he fell down the light shaft it was so dark that the opening in the floor of pen 57 could not be distinguished from the floor itself. There was no artificial light of any kind about this opening.

The grounds upon which appellant contends that the judgment should be reversed are: (1) That on the undisputed facts in the case appellee cannot recover as a matter of law; (2) that there is no evidence in the record of any negligence on the part of appellant; (3) that appellee was guilty of such contributory negligence as to preclude his recovery; and (4) that the trial court committed error in admitting certain evidence offered by appellee.

WINSTON, PAYNE, STRAWN & SHAW, (JOHN BARTON PAYNE, JOHN D. BLACK, and WALTER H. JACOBS, of counsel,) for appellant.

SAMUEL SHOPE PAGE, (CECIL PAGE, of counsel,) for appellee.

Mr. JUSTICE VICKERS delivered the opinion of the court:

The first, second and third contentions of appellant may all be considered together. By its motion to direct a verdict and the exception to the ruling of the court in denying it appellant has preserved for review the question whether there is any evidence fairly tending to support the verdict.

Appellant's principal contention is that the appellee was upon the premises as a mere licensee, and for that reason appellant owed him no duty except not to injure him willfully. Appellant owned the pens and furnished them to appellee and other shippers. These pens were supplied with water, and when requested by the owner of the hogs appellant furnished feed. For these privileges the shippers

paid the appellant compensation. Appellant did not furnish anyone to feed and water the hogs. This was done by the owner of the stock, either in person or by his agent to whom the hogs were consigned. In the late case of *Pauckner* v. *Wakem*, 231 Ill. 276, this court had under consideration a case involving the distinction between a mere licensee and one upon the premises of another by virtue of an invitation, expressed or implied. After discussing the rules of law applicable to the two relations, this court, on page 279, said: "It will be found that the distinction between a visitor who is a mere licensee and one who is on the premises by invitation turns on the nature of the business that brings him there, rather than on the words or acts of the owner which precede his coming. Permission involves leave and license, but it gives no right. If one avail himself of permission to cross another's land, he does so by virtue of the license and not of right. The permission of license is a justification for his entry, and while he is not technically a trespasser, yet the duty of the owner to guard him against injury is governed by the rules applicable to trespassers. * * * The duty to one who comes thereon by the owner's invitation to transact business in which the parties are mutually interested is to exercise reasonable care for his safety while on that portion of the premises required for the purpose of his visit. Under such circumstances the party is said to be on the premises by implied invitation of the owner." The nature of the business which appellant permitted to be transacted on these premises necessarily required the presence of both buyers and sellers of live stock. They must necessarily meet at the pens where the stock is lotted, to effect sales. Until the hogs are sold they belong to the shipper and are in his care and possession. The feeding and watering of the hogs prior to their sale are necessarily incident to the business of the market. Appellant furnished both feed and water, but it was the business of the shipper or his agent to supply the feed and water to

his hogs. Appellee was upon the premises at the time of the accident, not as a trespasser or licensee, but by virtue of implied invitation, and was entitled to the protection of the law requiring appellant to exercise reasonable care to guard him against injury.

Appellant suggests that even if appellee was properly upon the premises by invitation, he was clearly guilty of contributory negligence in climbing the fence to get out of pen 56 into pen 57. To this we cannot agree. Even if it could be said that appellee should have gone to the gate, or at least have climbed the fence which separated pen 56 from the alley-way, instead of climbing the division fence, still it must be borne in mind that appellee was not injured as a result of climbing the fence. The fence did not break, neither did appellee slip from the fence into the hole. He crossed over the fence in safety and was on the platform long enough to adjust the water spout before the accident. The result would have been the same had appellee crossed out of pen 56 to the alley-way and then gone around 57 and approached the hydrant by means of the platform or extension of the floor in the cut-off in 57, which was apparently left for persons to walk on in order to water hogs that might be in 57. It is what happened after the appellee was at the hydrant that caused his injury and not the route selected by appellee to reach the hydrant. We do not mean to hold that appellee was guilty of contributory negligence in climbing the fence to get to the spout. As already intimated, if he had desired to reach the hydrant in any other way he would have had to pass through pen 56, which must have been well filled with hogs. He would then have been compelled to climb the fence to get out of 56, since the evidence shows the gate was locked and the man who had the key was gone. Being in the alley-way, appellee would have to walk north and then climb the outer fence of 57, and then walk east until he encountered the division fence between the light-shaft and 57.

Appellant's final contention is that the court erred in permitting appellee, over its objection, to prove what the course of business was in handling stock through those yards and what practice was followed by owners or shippers of stock when they accompanied their stock to the yards. Several witnesses testified that it was a custom followed by many shippers to go into the yards to feed and water their own stock, and for this and other purposes connected with the business being done on the premises such persons would frequently climb over the fences of the pens. This evidence was given by several shippers and persons engaged in the commission business in the appellant's yards. The evidence tended to show that this had been the general course of business in the yards for a number of years. If, as this evidence tended to prove, shippers of stock to appellant's yards followed such a general practice, the degree of care required of appellant in keeping its premises in a reasonably safe condition must be determined in view of the manner in which persons rightfully thereon customarily used the premises. This testimony was proper under the holdings of this court in *Pennsylvania Co.* v. *Stoelke,* 104 Ill. 201; *St. Louis National Stock Yards* v. *Godfrey,* 198 id. 288; *North Chicago Street Railroad Co.* v. *Irwin,* 202 id. 345; *Chicago City Railway Co.* v. *Lowitz,* 218 id. 24; *Chicago, Rock Island and Pacific Railway Co.* v. *Rathneau,* 225 id. 278.

There are no other reasons urged for the reversal of this judgment.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

DUNN, J., CARTWRIGHT, C. J., and SCOTT, J., dissenting:

Appellee's hogs were consigned to the National Live Stock Commission Company and upon their arrival were delivered to the consignee. They were placed in pen No. 56, and the gate to the pen was locked by an employee of

the Stock Yards Company. It was the duty of the consignee to feed and water the hogs, and there was no necessity for appellee to go to the pen for that purpose. The evidence shows that it was not unusual for the owners and shippers of stock to go to the pens and see to it that the stock was fed and watered. It may be conceded that appellee had a right to go to pen No. 56 to look after his hogs, and that it was the duty of appellant to keep that pen and the approaches thereto in a reasonably safe condition for appellee's use. There is no ground for saying it did not do so. Beyond this appellant was under no obligation to appellee in regard to the construction of the hog house, or the manner of lighting the same, or the location of its light shafts. There was no obligation that the pens should be of the same size or the light shafts in the same position in relation to the pens. Appellant had a right to place a light shaft wherever it was required, or wherever, in appellant's judgment, it was required. When it had furnished to appellee's consignee a safe pen, with safe means of approach and egress, it could not reasonably anticipate that anyone rightfully using the pen would, in darkness and in ignorance of his surroundings, climb out of the pen into an adjoining light shaft instead of leaving by the safe approach provided for the purpose. Though the appellee may have thought it more convenient to go to another part of the premises to turn the water into the trough for his hogs, yet appellant owed him no duty to keep the adjacent parts of the premises in condition to be walked on. If pen No. 56 and its approaches were in reasonably safe condition, there was no breach of any duty to appellee if an adjoining pen was in an unsafe condition to be used.

Appellee did not exercise ordinary care for his own safety. While he had been at the stock yards a number of times before, he has no recollection of having ever been to pen No. 56 or No. 57. He had no knowledge of this part of the hog house. He had no right to assume that

all the pens were alike in construction or dimensions. In fact, pen No. 57 was shorter than pen No. 56. It had been shortened by cutting off part of the east side. The greater part of the floor of the part so cut off had been cut out for the purpose of giving light to the adjacent premises. The appellee had never seen either of the pens before this change was made. The change, therefore, did not affect him. Without a light, unable to see where he was going, he climbed over into what he supposed to be an adjoining pen. He was mistaken. It was not an adjoining pen, but a part of the premises used for an entirely different purpose. In darkness and in ignorance of his surroundings he proceeded with the same confidence as if in the light and in a familiar place. He climbed out of the pen set apart for his hogs, and, assuming that there was a pen on the other side of the fence, without looking or being able to see where he went, stepped into the opening. The accident happened because appellee went in the darkness, of his own accord, into a strange place without paying any heed to his steps or trying to ascertain where he was going.

In our judgment it was error to refuse to instruct the jury to find for the defendant.